UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ERIC THOMPSON, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 3:07-00412 |
| ) | Judge Sharp |
| ) | |
| BRUISTER AND ASSOCIATES, INC., ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

By Order and Memorandum issued contemporaneously herewith, the Court found that Defendant DirecTV is a successor employer under the Fair Labor Standards Act ("FLSA"). Now before the Court is Plaintiffs' Motion for Summary Judgment Regarding the Liability of Herbert C. Bruister ("Bruister") (Docket No. 623). That Motion has been fully briefed by the parties and, for the reasons explained below will be granted.

## I. FACTUAL BACKGROUND

The following facts are derived from Plaintiffs' "Statement of Material Facts as to Which There is No Genuine Dispute" (Docket No. 623-2) and Defendant Bruister's response (Docket No. 743) thereto:

Bruister founded Bruister and Associates, and incorporated it as a Mississippi corporation on July 16, 1992.[1] At that time, Bruister was the president and sole owner. During the period relevant to this case, 2004 to 2008, Bruister was president and a member of the BAI board of

---

[1] The corporation is now known as Southeastern Ventures, Inc.

1

directors. The only other member of the board of directors was BAI Comptroller Amy Smith.

Bruister was the sole owner and sole shareholder of BAI until 2002. He testified in his deposition that he would "live, eat, sleep, and drink his business." He also claimed that he "was there," and "didn't leave on vacation, but was there, everyday . . . or somewhere else doing business." (Bruister Depo. II at 72). At times, Bruister put his own funds into the company when it was struggling financially.

When Bruister first started the company, he personally hired each employee, the first three of whom were technicians. He also hired a sales manager. Bruister continued to make the hiring decisions regarding technicians and set their pay.

At some point, the business became too large for Bruister to make all decisions, and he delegated some issues to other people. In this regard, Todd DiPalma, Director of Operations, reported directly to Bruister, as did Amy Smith, the Comptroller, Mike McKelvanie, the Human Resources Manager, and Glenn Parker, the Inventory Manager. Bruister personally hired each of these managers, decided their salaries, and determined the scope of their authority. Regular management meetings were led by Bruister or DiPalma.

In their statement of undisputed material facts, Plaintiffs claim that, as the company grew, a management team began making decisions regarding technician pay and time capture, that Bruister was in charge of that management team, that he was involved in the decisions regarding how to pay technicians, that the pay policies for technicians were ultimately his decisions, and that he was involved with all major decisions regarding the manner in which technicians were paid across the company. Bruister disputes each of these contentions, and relies exclusively on the following excerpts from his deposition testimony:

2

Q. Okay. What things weren't you in control of?

A. Things that had been designated to others.

Q. Okay. And who would do the designation?

A. Quite often I would.

Q. Okay, so when you say control, you weren't in control of everything all the time, that's because you would have designated those tasks to somebody else down the pipeline.

A. Correct.

Q. Okay. Who were people that reported to you at Bruister & Associates?

A. All of them.

Q. Okay. Who were your direct reports?

A. I may have missed a few.

Q. Okay.

A. Todd DiPalma, Don Smith, Amy Smith, David Smith, Glenn Parker.

A. Well, I made all of the major decisions up to a certain point, and then there were -- and as we grew, some the - some of - those issues, questions, were delegated to other people who -- who made those decisions or were very instrumental in making those decisions.

A. Well, generally, the operations people were given a lot of leeway in who was hired. They would do the interviews. Generally, they would do the hiring.

A. The reason I'm fighting that a bit is because, first of all, you haven't given me a time period, and as that company grew, there were times when decisions were made and implemented and I may or may not have been involved at all in that decision-making process.

A. So there were times when I did - I was involved, and - and I, you know - and I'm the one that said, yeah, let's do that. There's other times when we were big and I had delegated things to other people and let them do it and let them make decisions.

3

(Docket No. 743 at 31-35).[2]

Notwithstanding the foregoing equivocation as to what decisions Bruister did or did not make, he admits that he regularly inquired about how much the company spent on payroll for the week because the amount was of concern to him. He also admits that "he was an involved employer," and that the relationship between field technicians and management was important to him. Further, with regard to his involvement in, and responsibility for, compliance with the FLSA, Bruister testified:

> A. Probably not as much as some others, because I -- I didn't – wasn't involved in the day-to-day. I mean, the main thing we were complying with the FLSA is to make sure we paid everybody for every hour they worked and paid their overtime. I mean, those were the key components. …
>
> Q. Well, did you have any specific responsibilities with respect to ensuring that Bruister and Associates complied with the Fair Labor Standards Act?
>
> A. Only as setting the standards for the company. You know, it was kind of a mantra, for me, to make sure everybody gets paid and gets paid on time and gets paid everything they deserve to be paid.

(Id. at 37).

During the period relevant to this case, DirectTV was BAI's only client, and the source of virtually all of its income. The relationship between DirecTV and BAI was governed by Home Service Provider (HSP) agreements, all of which were signed by Bruister. Additionally, Donna Smith, Field Performance Manager, reported statistics regarding DirecTV's metrics (i.e. ratings that DirecTV used to measure the performance of its HSPs) to Bruister on a regular basis, and met with him on a regular basis.

---

[2] The last four answers are provided by Defendant without the context or the question to which they relate.

Bruister was concerned with the company meeting DirecTV's metrics, and would discuss those metrics with DirectTV. DirecTV contacted Bruister directly to tell him about new metrics DirecTV would be reviewing, contacted him when it was dissatisfied with the performance of BAI's managers, and contacted him regarding audits of BAI's performance. Further, Bruiser paid close attention to the profitability of the company, and would inquire from DirectTV as to when payments would be made.

In 2002, BAI established an Employee Stock Ownership Trust ("ESOT") which formed a part of and implemented an Employee Stock Ownership Plan ("ESOP"). Bruister was a member of the ESOT's Board of Trustees. In early 2004, BAI formed an Associates Eligible Individual Account Plan ("EIAP").

Over a series of transactions beginning in December 2002, the ESOT acquired stock held by Bruister, and stock held by the Bruister Family Limited Liability Company ("BFLLC") of which Bruiser and his wife were each 50% voting members. The result of the transactions was that the ESOT became the sole shareholder of BAI.[3]

Even after Bruister officially sold his ownership shares in the company, he continued as President, remained a member of the board of directors, and was an employee of BAI. During this period, he was still very much a hands-on president and very involved in running the company. Documents were signed with Bruister's signature, indicating that he was still the president and/or

---

[3] According to Defendant, the ESOT acquired approximately 34.41% of the issued and outstanding shares of BAI common stock from Bruister on December 30, 2002; approximately 15.48% of the issued and outstanding shares of BAI common stock from Bruister on December 19, 2003; approximately 20% of the issued and outstanding shares of BAI common stock from BFLLC December 21, 2004; approximately 3.16% of the issued and outstanding shares of BAI common stock from BFLLC on September 13, 2005; and approximately 26.94% of the issued and outstanding shares of BAI common stock December 13, 2005, although Defendant does not indicate whom that stock was acquired from.

5

owner of the company, including tax documents, business licenses, and a union agreement.[4] Virtually all corporate checks were either signed by Bruister personally, or stamped with his signature. Employee paychecks bore a facsimile of Bruister's signature.

On November 13, 200, BAI entered into a Loan and Security Agreement with MB Financial Bank, N.A. ("MB Financial") for an operating line of credit, including a revolving loan of $8.5 million and a term loan of $8 million. Part of the collateral for the MB Financial loan was an investment portfolio of viaticals.[5]

In the summer of 2008, DirecTV purchased the MB Financial loan, assumed BAI's assets and foreclosed on the loan. BAI ceased operations and DirecTV assumed and continued its operations. As a part of the deal, Bruister and Associates Investments paid $4 million to MB Financial to release the viatical portfolio. Subsequently, Bruister Family LLC foreclosed on Bruister and Associates Investments LLC and purchased its assets (consisting of the viatical portfolio) for $4.5 million.

At the time the company ceased operations in August 2008, Bruister was paid an annual salary of $300,000. DirecTV agreed to pay Herbert Bruister $861,516.16 to serve as a consultant to help with the transition for the first year after DirecTV's takeover. Since the cessation of the business, BAI employment records have been stored in a warehouse in Meridian, Mississippi owned by Bruister. He claims, however, that he does not control those records, and that he has kept the

---

[4] According to Defendant, the first the tax documents and licenses were not filled out by him, but rather by BAI's comptroller. As for collective bargaining agreement, he admits to signing the same as "owner and chief executive officer," that it "was probably a signing error," and "[i]t probably should have been styled a little different. (Docket No. 743 at 15).

[5] The viatacal portfolio was owned by another Bruister entity, Bruister and Associates Investments, LLC. The portfolio was its only asset, and proceeds from the portfolio were paid to the ESOT.

6

Case 3:07-cv-00412   Document 809   Filed 03/15/13   Page 6 of 12 PageID #: 16161

records in the warehouse based upon the litigation hold advice from counsel.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. APPLICATION OF LAW

7

The FLSA creates a private right of action for employees not properly compensated against any "employer," 29 U.S.C. § 216(b), with "employer" defined broadly to include "any person acting directly or indirectly in the interests of an employer in relation to an employee." 29 U.S.C. § 203(d). This expansive definition of employer has led to an "overwhelming weight of authority" which holds that "'a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.'" Lamonica v. Safe Hurricane Shutters, Inc., ___ F.3d ___, ___, 2013 WL 811906 at *6 (11th Cir. 2013) (citation omitted). Included in this authority is a long string of cases from the Sixth Circuit. See e.g., Ellington v. City of East Cleveland, 689 F.3d 549 (6th Cir. 2012); Dept. of Labor v. Cole Enterprises, Inc., 62 F.3d 775 (6th Cir. 1995); Fegley v. Higgins, 19 F.3d 1126 (6th Cir. 1994); Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962 (6th Cir. 1991).

From such cases, several principles can be distilled. First, because the FLSA is a remedial statute, courts are required to define "employer" more broadly than the term is interpreted under traditional common law principles. See, Dole, 952 F.2d at 965. Second, in determining whether an individual is an employer, the "economic reality" of the situation controls. Dole, 942 F.3d at 965. This economic reality standard " is not a precise test susceptible to formulaic application," but "prescribes a case-by-case approach where the court 'considers circumstances of the whole business activity." Ellington, 689 F.3d at 555. Third, whether an individual "is an employer within the meaning of the FLSA . . . is a question of law, rather than fact." Cole. 67 F.3d at 778; accord, Dole, 952 F.2d at 965.

Application of such principles led the Sixth Circuit in Dole to conclude that "that an individual who was chief corporate officer, had a significant ownership interest in the corporation,

8

and controlled significant day-to-day functions of the business, including determining salaries, was personally liable under the FLSA." Fegley, 19 F.3d at 1130. Likewise, in Fegley, the court held that the chief executive officer of a company who "had a significant ownership interest in it, controlled significant functions of the business and determined the salaries and made hiring decisions" was an employer for purposes of the FLSA. Id. Similarly, in Cole, the president and 50% owner of the company was held to be an employer under the FLSA where he "was engaged in running the business . . . was authorized to issue checks on the corporate accounts . . . had control of the employment records [and] determined the employment practices. . .including hiring, firing, rates of pay and hours of work." Cole, 62 F.3d at 778.

As the recitation of the facts makes clear, Bruister was the backbone of BAI, was very involved in its operation, had a significant financial stake in the business, and was ultimately responsible for all important decisions, including those involving pay. Bruister's involvement in the day-to-day operations began from BAI's inception and continued until the time that DirectTV assumed control of BAI's assets.[6]

Bruister was President and one of only two individuals on the board of directors. He alone hired all of the initial employees. He supervised BAI's top managers, all of him he personally hired, holding and often leading regular management meetings.

Bruister scrutinized BAI's figures, monitored its profitability, and insured that BAI was complying with DirecTV's requirements. This was extremely important because DirectTV was BAI's only customer and the source of virtually all of its revenue. The relationship between

---

[6] Even after DirectTV took control, Bruister remained on the payroll as a highly compensated consultant.

9

DirectTV and BAI was governed by HSPs which Bruister helped to negotiate and which he signed.

Bruister's signature (or a facsimile thereof) appeared on virtually all corporate checks, including the employee's pay checks. Additionally, he signed loans on behalf of BAI, and pumped money into BAI as necessary.

With regard to the pay policies that are at issue in this case, Bruister's and others' deposition testimony indicates that the technician pay policies were ultimately Bruister's decision to make, and he was involved in meetings about pay. Bruister conceded in his deposition that compliance with the FLSA was his responsibility and claimed that it was his "mantra . . . to make sure everybody gets paid and gets paid on time and gets paid everything they deserve to be paid." Moreover, Bruister regularly inquired about how much money was being spent, including on payroll, something one would expect from a person who virtually ran and had a significant stake in the company.

In his response to Plaintiffs' motion for partial summary judgment, Bruister spends a great deal of his time arguing about why this collective action should be decertified, and why many of the things about which Plaintiffs complain are not violations of the FLSA and/or not compensable. These are issues that are distinct from the issue of whether Bruister should be deemed an employer for purposes of the FLSA.

Bruister also argues that he was instrumental in forming an ESOP, "cared deeply about his employees, and was one of the first in the industry to pay hourly wages to W2." (Docket No. 744 at 8). This may be laudable, but it, too, is unresponsive to the question of employer liability.

Bruister makes a feeble attempt to distance himself from the reality that BAI was really his show by pointing to vanilla statements in his deposition to the effect that he did not make all of the decisions and that even some "big decisions" were made by underlings. That simply is not enough

10

to create a genuine issue of material fact as to economic realities of the situation and whether he had significant day-to day control over the business.

Bruister also argues that he and the technicians did not work in the same building and "generally had no personal contact." (Id. at 9). He then cites two wholly inapposite cases for the proposition that unexercised authority is insufficient to establish liability of an employer.

Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150 (11th Cir. 2008) was a case where there "was insufficient evidence for a jury reasonably to conclude" that the operator of a greyhound racetrack was an "employer" for purposes of the FLSA because the undisputed evidence was that "he did not take . . . an active role in the day-to-day operations" after he suffered a heart attack, even though he could have played such a role "if he had desired[.]" Id. at 1161. Gray v. Powers, 673 F.3d 352 (5th Cir. 2012) stands for the general proposition that merely being an officer or shareholder does not subject an individual to FLSA liability in the absence of operational control, and operational control was not shown where the member of a limited liability corporation that ran a nightclub "only visited the club on five or six occasions during the seventeen months the club was open for business" Id. at 353.

The facts that have been developed in this case stand in stark contrast to those in Perez and Gray, are much closer to those presented in the Sixth Circuit decisions of Dole, Cole, and Fegley, and compel the conclusion that Bruister was an employer for purposes of the FLSA.

### III. CONCLUSION

On the basis of the foregoing, Plaintiffs' Motion for Summary Judgment Regarding the Liability of Herbert C. Bruister (Docket No. 623) will be granted.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE