UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ERIC THOMPSON, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 3:07-00412 |
| ) | Judge Sharp |
| ) | |
| BRUISTER AND ASSOCIATES, INC., ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Among the many motions in this case are Cross-Motions for Summary Judgment (Docket Nos. 585 & 667) that present the question of whether successor liability exists under the Fair Labor Standards Act ("FLSA"). It is appropriate that the Court begin with this question, as yet unanswered by the Sixth Circuit, because it affects whether DirectTV LLC's coffers may eventually be tapped to satisfy any judgment in this collective action. This may be of no small significance because Plaintiffs' former employer, Bruister and Associates ("BAI") is now little more than a hollow corporate shell.

### I. FACTUAL BACKGROUND[1]

DirecTV is a provider of satellite television and internet services. From December 29, 2000 to August 11, 2008, DirecTV entered into Home Service Provider ("HSP") Agreements pursuant to which BAI, as an independent installation contractor, installed and serviced satellite systems for

---

[1] The Court summarizes the relevant facts to place the parties's arguments in context. These facts will be expanded upon where necessary for purposes of the legal discussion.

1

DirecTV's customers in several defined marketing areas that covered parts of Alabama, Florida, Georgia, Kentucky, Mississippi, and Tennessee.

On November 13, 2007, BAI entered into a Loan and Security Agreement with MB Financial Bank, N.A. ("MB Financial" or "bank") for an operating line of credit, including a revolving loan of $8.5 million and a term loan of $8 million. Bruister and Associates Investments, LLC, an entity affiliated with BAI, guaranteed up to $3 million of the loan with a viatical portfolio. The remainder of the loan was secured by collateral, including BAI's receivables, inventory, and goods, such as software, equipment, vehicles, and furniture.

During all relevant times, DirecTV was BAI's only client and was the source of substantially all of BAI's income. In fact, DirectTV paid BAI over $90 million in 2007 (the year of the loan) for the services it performed pursuant to its HSP Agreements with BAI.

On May 12, 2008, MB Financial notified BAI that it was in default of its obligations under the Loan and Security Agreement, owing close to $7.5 million in principal and interest on the revolving loan, and close to $7.6 million in principal and interest on the term loan. MB Financial informed BAI that it would not advance any further funds.

In April or May of 2008, Herbert Bruister, the president and founder of BAI, approached DirecTV to request cash advances so that BAI could cover payroll and other expenses. DirecTV made advanced payments to BAI to help cover those expenses. DirecTV was interested in aiding BAI because it wanted to ensure that service to its customers in BAI's territories would not be interrupted or adversely affected, and began to consider whether it could avoid disruption to DirecTV's customers by acquiring the company through an asset or stock purchase.

On May 16, 2008, DirecTV Enterprises, LLC and BAI executed a Mutual Nondisclosure

Agreement governing the exchange of confidential information to facilitate the exploration of a potential business arrangement whereby DirecTV would acquire the stock and/or assets of BAI. DirecTV requested certain documents from BAI as part of its due diligence review of the company, Those documents were provided through a data room, or online server.

At this time, DirecTV decided not to pursue a stock or asset purchase because BAI was "so far under water," and had too many liabilities. Among the liabilities was a "whole book of litigation," including this case. DirectTV looked at other alternatives.

In June 2008, DirecTV began discussing a potential arrangement with BAI whereby they would work together to in an effort to resolve the loan from MB Financial. DirectTV then had discussion with MB Financial to see if the bank would be willing to compromise on the loan.

On July 21, 2008, representatives of BAI, DirecTV, and MB Financial met and tentatively arrived at a preliminary three-way agreement. Under the agreement, BAI would pay MB Financial $4 million; DirecTV would purchase the remaining loan obligations from MB Financial for $4.7 million, and, in exchange, MB Financial would assign DirecTV all of its rights as a secured creditor under the loan agreement. By this time, DirectTV had already advanced $5.5 million to BAI for payroll and other expenses.

On August 1, 2008, the parties executed a formal Assignment Agreement, whereby, as previously agreed, DirecTV would pay $4.7 million to purchase MB Financial's rights under the loan agreement. Additionally, Bruister Family, LLC, a BAI affiliate, agreed to pay $4 million to release the personal guaranty for the original loan agreement provided by Bruister and Associates

Investments, LLC, and the lien on the viatical portfolio.[2]

DirecTV scheduled a foreclosure sale for August 11, 2008. The purpose of the sale was to extinguish claims to BAI's collateral. A $1 million figure was set as the minimum price for the collateral. No HSPs were invited to the sale, and no other parties bid at the sale. DirecTV purchased the collateral and, while no money exchanged hands, one million dollars was credited against the money BAI owed DirecTV. As of the time of the foreclosure sale, BAI was insolvent, and is as of this date.

After the foreclosure sale, DirecTV, Inc. through either DirecTV Home Services or 180 Connect[3] conducted business out of BAI's locations.[4] Further, the team working on the BAI transition post-foreclosure included personnel from DirectTV and 180 Connect.

The facilities that DirecTV assumed included warehouses, corporate offices, call centers, and storage units. DirectTV (or 180 Connect until October 1, 2008) operated out of those facilities.[5]

---

[2] BAI's accountant estimated that the viatical portfolio was worth approximately $4.75 million at the time. DirectTV claims the present value of the portfolio is between approximately $26 and $27million.

[3] DirecTV Home Services was a d/b/a for DirecTV, Inc.; 180 connect was a subsidiary of DirecTV, Inc., having been a former HSP that was acquired through a stock purchase acquisition on July 9, 2008. On October 1, 2008, 180 Connect Employees became DirectTV employees. In December 2011, DirecTV, Inc. merged with another DirecTV entity, DirecTV Operations, LLC, and the resulting entity is known as DirecTV, LLC.

[4] BAI operated out of 21 facilities. All but the lease to the Gadsden, Alabama facility was assigned to DirecTV because DirecTV decided it was not interested in the facility. BAI closed the Gadsden facility on August 9, 2008, prior to the foreclosure sale.
The International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers - Communications Workers of America (IUE-CWA), Local 83-711 filed a charge with the National Labor Relations Board alleging that DirecTV decided not to take on the Gadsden facility because it was the only BAI facility that was unionized. DirecTV filed a position statement asserting that the decision was due to the fact that the Gadsden facility performed poorly. Ultimately the Board dismissed the charge.

[5] At least one of those facilities, a call center facility in Meridian, MS was owned by Bruister, but leased by him to BAI. From August 2008 to December 2010, DirecTV paid Herbert Bruister $180,107.76 in rent for the use of the call center.

BAI provided DirecTV with the names and addresses of all its employees (as provided for under the HSPs), and the companies worked together to ensure a "smooth" and "seamless" transition for employees who were terminated by BAI and subsequently hired by DirecTV. Before the foreclosure sale, DirecTV sent notices of the impending change to all BAI employees (except those at Gadsden), including: (1) a new hire packet with employment application and payroll forms; (2) frequently asked questions about the transition; (3) an offer letter[6]; and (4) retention bonus information. Additionally, DirectTV set up a live hotline to field BAI employees' questions, and, during the first week of August 2008, sent human resources employees to each of the 15 primary BAI sites to conduct orientation sessions, respond to questions, help individuals complete forms, conduct new hire orientations, and oversee drug and background testing.

Of the former 1,100 or so employees of BAI, 180 Connect hired 1,005 of them, including a number of management and upper level management employees, and more than 80 of the Plaintiffs in this action.[7] Bruister was hired as a consultant by DirectTV and paid $861,516.16 to serve as a consultant to help with the transition for the first year, working out the same office that he had used while serving as President of BAI.

Most of BAI's installers that were hired by 180 Connect continued doing substantially the same jobs. DirecTV did not make any broad changes to jobs and functions, job titles, job responsibilities, or the technicians' supervisors, and BAI's hourly scale and current pay status and rates for the employees remained in place. DirecTV also honored vacation time and other benefits employees had accrued during their employment with BAI, and used former BAI employees' hire

---

[6] The offer was contingent upon the passing of a background check.

[7] Those who stayed on board during the acquisition process received retention bonuses. Some of the employees who were not retained received severance pay from DirectTV.

dates with BAI as their effective hire date with DirecTV for tenure and benefits purposes.[8] DirectTV did, however, immediately change its payroll, and some of the job duties of the managers were not the same.

As a result of the foreclosure sale, DirecTV acquired an interest in the collateral listed in Section 6.1 of the Loan and Security Agreement, including all of BAI's property, such as accounts, inventory, goods (furniture and fixtures), software, securities, chattel paper, and insurance policies and proceeds. DirecTV was provided access to historical information on personal computers and servers used in BAI's business, and migrated former BAI computers into its network. DirecTV also assumed BAI's data and voice circuits and internet domains, and continued to use all circuit that were in place and working.[9] After DirecTV formed a new internet domain for DirecTV Homes services, DTVHS.com, the former BAI locations were transferred to that new domain name.

By separate contract effective August 11, 2008, DirecTV assumed the leases for all field service personnel fleet vehicles, and continued to use the same installation equipment, including the tools and equipment stored on the trucks, set-top boxes, satellite dishes, and other equipment, as well as vehicles acquired from BAI following the foreclosure. BAI also assigned DirecTV various service contracts, including a contract with Total Design Solutions for inventory and personnel services, a contract with ONTOP Systems, Inc. for a Summit financial application, and a contract with Prime Alert for security monitoring. BAI also assigned to DirecTV its rights under all insurance policies for which DirecTV was named as an additional insured in accordance with the

---

[8] This was in keeping with DirectTV's answer to "Frequently Asked Questions" that "[t]he intent is that you will continue with your current job title and responsibilities and report to the same manager," and the stated intention to avoid any interruption in employee benefits.

[9] DirecTV determined that the voice circuits were working well, but that most of the data circuits had to be replaced.

6

terms of the Home Service Provider Agreements. [10]

Following the foreclosure sale, there was no interruption of the installation and repair services to DirecTV customers. As before, work was assigned to the technicians through the Siebel system, which DirecTV used to process customer accounts and assign work.[11] DirecTV was also provided with access to BAI's historical customer information.

## II. STANDARD OF REVIEW

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." Ferro Corp. v. Cookson Group, PLC, 585 F.3d 946, 949 (6th Cir. 2009). A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party

---

[10] After the foreclosure, DTV continued to make payments on behalf of BAI for damage claims to customers' property that related to periods before August 11, 2008.

[11] Apparently, the Siebel system was in use nationally and had been in place prior to BAI's exit from the HSP market.

7

does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

As indicated, the parties have filed cross-motions for summary judgment on the issue of whether DirecTV is potentially liable under the FLSA as a successor employer. In opposing Plaintiffs' motion and in support of its own motion, DirectTV is quick to point out that "noticeably absent from [Plaintiffs'] motion and brief" is any citation "to an opinion from the Sixth Circuit applying the successor doctrine under the FLSA." (Docket No. 668 at 10). But, contrary to DirectTV's suggestion, the Sixth Circuit's silence hardly speaks volumes because it appears that court, like the vast majority of circuit courts, has yet to be presented with the issue.

Although the Sixth Circuit has not decided the precise issue before the Court, it has adopted the federal common law of successor liability in employment law cases. Indeed, after "[t]he Supreme Court first applied the doctrine of successor liability in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 542, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), a National Labor Relations act case," the Sixth Circuit "extended the rule of successor liability to remedies under Title VII" in EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086, 1090-91 (1974). Huguley v. Gen'l

8

Motors Corp., 67 F.3d 129, 133 (6th Cir. 1995). In doing so, the court "concluded 'that the considerations set forth by the Supreme Court . . . as justifying a successor doctrine to remedy unfair labor practices are applicable equally to remedy unfair employment practices under Title VII." Id. (quoting, MacMillan, 503 F.2d at 1090.

The MacMillan decision was significant because it "laid the framework for a multi-factor approach that would subsequently be adopted in several circuits and codified in the FMLA's regulations." Cobb v. Contract Transport, Inc., 452 F.3d 543, 554 (6th Cir. 2006). Nevertheless, the fact that the Sixth Circuit extended the doctrine of successor liability to Title VII and Congress codified the MacMillan factors in the FMLA does not mean that successor liability is automatically appropriate in FLSA cases because, as the Supreme Court has recently reiterated, a court "'must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.'" Gross v. FBL Financial Services, Inc., 557 U.S. 167, 174 (2009) (quoting, Federal Express Corp. v. Holowecki, 128 S.Ct. 1147, 1153 (2008)).

Building on this principle, DirectTV observes that "[t]he best evidence of Congress's intent is the statutory text," National Federation of Independent Business v. Sebelius, 132 S.Ct. 2566, 2583 (2012), and argues that if Congress thought it appropriate to impose successor liability under the FLSA it would have adopted implementing regulations for the same, just as it did for the FMLA. DirectTV cites no authority for the proposition that the absence of similar regulations in the FLSA suggests that either the Department of Labor or Congress disapproves of successor liability under the FLSA, and it is doubtful that is the case since the Sixth Circuit has repeatedly observed that Congress intended similar remedies for both the FLSA and the FMLA. See, Chandler v. Specialty Tires of America (Tennessee), Inc., 283 F.3d 818, 827 (6th Cir. 2002); Frizzell v. Southwest Motor

9

Freight, 154 F.3d 641, 644 (6th Cir. 1998). Moreover, DirectTV does not cite a single opinion where successor liability has been rejected as a matter of law in an FLSA case, yet there are many cases which recognize the doctrine's applicability to FLSA cases. See, e.g., Battino v. Cornelia Fifth Ave., LLC., 861 F. Supp.2d 392, 401-02 (S.D.N.Y. 2012); Paschal v. Child Develop, Inc., 2012, WL 1660688 at *1 (E.D. Ark May 11, 2012); Garcia v. Serpe, 2012 WL 380253 at **12-14 (D. Conn. Feb. 16, 2012); Ordonez v. Akorat Metal Fabricators, Inc., 2011 WL 6379290 at *3 (N.D.Ill. 2011); Chao v. Concrete Mgmt. Resources, L.L.C., 2009 WL 564381 at *3 (D. Kan. Mar. 5.2009); Brock v. LaGrange Equip. Co., 1987 WL 39105 at *1 (D. Neb. July 14, 1987).

Most of the cases which have found successor liability under the FLSA rely upon the Ninth Circuit's decision in Steinbach v. Hubbard, 51 F.3d 843 (9th Cir.1995), which appears to be the only circuit court to have directly addressed the issue. In holding that successorship liability exists, the Ninth Circuit wrote:

> The FLSA, like virtually all employment law statutes, does not discuss whether the liabilities it creates may be passed on to innocent successor employers. However, beginning with cases under the National Labor Relations Act ("NLRA"), federal courts have developed a federal common law successorship doctrine that now extends to almost every employment law statute. . .
>
> Successorship liability was originally adopted under the NLRA to avoid labor unrest and provide some protection for employees against the effects of a sudden change in the employment relationship. . . . In deciding to extend successorship liability to other contexts, courts have recognized that extending liability to successors will sometimes be necessary in order to vindicate important statutory policies favoring employee protection. . . . Where employee protections are concerned, "judicial importation of the concept of successor liability is essential to avoid undercutting Congressional purpose by parsimony in provision of effective remedies." . . .
>
> The FLSA was passed to protect workers' standards of living through the regulation of working conditions. 29 U.S.C. § 202. That fundamental purpose is as fully deserving of protection as the labor peace, anti-discrimination, and worker security policies underlying the NLRA, Title VII, 42 U.S.C. § 1981, ERISA, and MPPAA. The analysis set forth in the cases extending potential liability under these statutes

10

> justifies application of the doctrine here as well. Consequently, we conclude that successorship liability exists under the FLSA.

Id. at 845-46 (internal case citations omitted). Interestingly enough, the Ninth Circuit cited MacMillan for the proposition that the extension of liability to successors may be necessary to fulfill a statute's intention to protect employees.

Given that the Sixth Circuit has recognized successor liability in the employment context, given that courts which have directly addressed the issue unanimously appear to hold that successor liability can be appropriate in FLSA cases, given that "'[t]he remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications,'" Ellington v. City of East Cleveland, 689 F.3d 549, 554-55 (6th Cir. 2012) (citation omitted), and given the absence of any convincing arguments or authority to the contrary, the Court finds that, in appropriate cases, the doctrine of successor liability should be applied in FLSA cases. The Court also finds that this is an appropriate case to impose successor liability.

"[T]he appropriateness of successor liability depends on whether the imposition of such liability would be equitable." Cobb v. Contract Transp., Inc., 452 F.3d 543, 553-54 (6th Cir.2006). "Courts that have considered the successorship question in a labor context have found a multiplicity of factors to be relevant. These include: 1) whether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisory personnel, 7) whether the same jobs exist under substantially the same working conditions, 8) whether he uses the same machinery, equipment and methods of production and 9)

whether he produces the same product." MacMillan, 503 F.2d at 1094.[12] Considering those factors, as well as the overall equities, the Court is persuaded by the evidence which has been presented that DirectTV, as a matter of law, is liable as a successor employer to BAI.

Here, there is little doubt that DirectTV knew or should have known of the pending litigation. See, Musikiwamba v. ESSI, Inc., 760 F.2d 740, 752 (7th Cir. 1985) ("Normally, the burden [is] on the successor to find out from the predecessor all outstanding potential and actual liabilities"). In addition to being among the "Known Litigation" documents placed in the data room (and leaving aside that DirectTV's counsel in this case also represented BAI), this litigation was in the loan document that DirectTV purchased from MB Financial, and this Court's docket is a matter of public record.[13]

It is also clear that BAI, the predecessor employer, is unable to provide relief because BAI is now little more than a hollow shell. Contrary to Defendants' position, this case does not present the concerns (addressed in cases like Steinbach, 51 F.3d at 844-45) about plaintiffs attempting to improve their position by filing claims on the eve of a takeover in an attempt to reach deep pockets, because this case was filed at a time when BAI was solvent and long before it began looking for a suitor.

Nor is the Court persuaded by the contention that it would be inequitable to hold DirectTV

---

[12] In Cobb, the Sixth Circuit noted that these nine-factors "are not in themselves the test for successor liability," but are "factors that courts have considered when applying [a] three prong balancing approach [that] consider[s] the defendant's interest, the plaintiff's interest, and federal policy." Cobb, 452 F.3d at 554.

[13] The record also indicates that Plaintiffs served third party subpoenas on DirectTV, albeit after DirectTV had executed the preliminary agreement on July 22, 2008, but apparently before the formal Assignment Agreement on August 1, 2008. Additionally, email communications dated July 29, 2008, between DirecTV and BAI referenced the "FLSA litigation" in which DirecTV and BAI were both "involved[.]"

12

liable because Bruister himself has money. This argument presupposes that Bruister can be held liable as an "employer," and, while the Court finds that to be the case in an Order entered contemporaneously herewith, it is speculative at best to assume that either he, or his viatical portfolio, are sufficient to cover any potential judgment. Moreover, the fact that Bruister may be liable neglects to consider that "successor liability 'is fundamentally a form of secondary, vicarious liability imposed upon an innocent party.'" Vorcom Internet Serv., Inc. v. L & H. Eng'g LLC, 2013 WL 335717 at *6 (S.D.N.Y. Jan. 9, 2013).

As the recitation of the facts make clear, the remaining seven factors all weigh heavily in favor of a finding of successor liability. The undisputed evidence before the Court establishes that DirectTV continued to use the same facilities as BAI; continued to employ the majority of rank-and-file employee in the same jobs and under substantially the same working conditions; continued to use the same equipment and infrastructure; and continued to provide the same service to the same customer base.[14]

## IV. CONCLUSION

On the basis of the foregoing, the Court concludes that successor liability is appropriate under the FLSA, and finds that DirectTV LLC is a successor employer to Bruister and Associates, Inc. for purposes of this litigation. As such, Plaintiffs' motion for summary judgment on the successor liability issue will be granted and DirecTV's motion on that issue will be denied.

---

[14] This conclusion is not altered by the fact that the BAI employees were, as a technical matter, originally hired by 180 Connect. That entity was a subsidiary of DirectTV, and 180 Connect employees became DirectTV employees at the latest on October 1, 2008.

13

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

Case 3:07-cv-00412   Document 811   Filed 03/15/13   Page 14 of 14 PageID #: 16182