**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **ERIC THOMPSON**, *et al.*,     ) | |
|     ) | |
|    **Plaintiffs,**     ) | |
|     ) | |
|    **v.**     ) | **No. 3:07-00412** |
|     ) | **Judge Sharp** |
|     ) | |
| **BRUISTER AND ASSOCIATES, INC.,**     ) | |
| *et al.*,     ) | |
|     ) | |
|    **Defendants.**     ) | |

## MEMORANDUM

This is a collective action involving claims on behalf of more than 1,700 cable technicians who worked under what they allege was a "culture of off-the-clock work," wherein they were expected to perform over an hour of uncompensated work each day.  Pending before the Court are Motions to Decertify (Docket Nos. 674 and 676) and Motions to Dismiss the Collective Action (Docket Nos. 604 and 605) filed by Defendants DirecTV, Bruister and Associates, Inc. ("BAI") and Herbert C. Bruister.  Those Motions have been fully briefed by the parties and, for the following reasons, will be denied.

## I.  PROCEDURAL POSTURE

On April 16, 2007, eight former BAI filed suit in this court alleging that they were not fully compensated for all hours worked.  On June 5, 2007, Plaintiff sought collective certification of this action on behalf of themselves and all similarly situated employees of BAI for alleged violations of the minimum wage, overtime pay, and record keeping provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 207, and 211.  While the request for certification was pending,

Plaintiffs amended the Complaint to add Herbert C. Bruister as an individual Defendant.

On March 11, 2008, the court granted Plaintiffs' Motion for Collective Certification and conditionally certified this case against BAI. On March 11, 2009, the Court granted Plaintiffs' Second Motion for Leave to Amend Complaint which added DirecTV as a Defendant.

Since then, the Court has issued opinions finding that Defendant Herbert C. Bruister was an employer within the meaning of the FLSA (Docket Nos. 809 & 810), and that DirectTV LLC is a successor employer to BAI for purposes of the claims in this action. The Court has also denied the parties' Cross Motions for Partial Judgment on the Motor Carrier Act exemption to the FLSA (Docket Nos. 807 & 808).

As it now stands, the collective action consists of a class of 1,736 technicians. The claims cover the time span from April 17, 2004 through August 10, 2008.

## II. <u>FACTUAL BACKGROUND</u>

BAI was engaged as a contractor for DirecTV pursuant to Home Service Provider Agreements ("HSPs"). In accordance with those agreements, DirecTV hired BAI to install and service DirecTV satellite television products in customers' homes and offices in defined marketing areas covering parts of six states. During the relevant period, DirecTV was BAI's only client.

Plaintiffs are technicians who were hired by BAI to install and service DirecTV products. The technicians traveled throughout the workday from job to job, some in their personally owned vehicles ("POV technicians)", and others in company owned vehicles ("COV technicians"). POV and COV technicians performed the same type of work.

Technicians were required to be in phone contact with the office so that BAI always knew the status of its technicians. They were also required to complete work orders for each completed

job, which included the customer's name and address, DirecTV account number, dish type, date, technician number, and the "start" and "stop" times. When a technician arrived at a job site, the office would provide the technician a "start" time. When the job was completed, the technician would call DirecTV to activate the satellite system, and call the BAI dispatch center to close the work order.

Defendants expected the technicians to complete each job as quickly and efficiently as possible, then to travel from one job to the next in the most expeditious and safe manner possible. Productivity was important to BAI because if technicians were producing at a lower rate than what DirecTV was paying, BAI would lose money.

To maximize productivity, BAI implemented a system to measure productivity and offered bonuses for productive technicians. The more jobs a technician was able to complete in as few hours as possible, the more productive he or she would be. For at least some period of time, employees who did not meet production goals were paid the Florida minimum wage of $6.40 per hour, and were generally not allowed to work overtime.

When BAI began operations, all technicians were POV technicians. POV technicians were paid on a piece-rate basis,[1] and were required to provide their own vehicle and tools. They were also responsible for fuel and vehicle maintenance costs.

Under the piece-rate system, technicians received a specified dollar payment for each type of installation activity. Pay was determined based upon BAI's review of a report created by DirecTV identifying all work orders closed by each installer. Technicians were also required to keep time sheets on which they were supposed to record all hours, but they claim those time sheets

---

[1] BAI technicians were paid on a piece rate basis from April 2004 until September 16, 2006.

understated the hours actually worked because they were discouraged from reporting more than forty hours per week and they were not instructed to count any time that they may have spent working before the first job of the day, or after the last job of the day.

Sometime in mid-September 2006, BAI began using an automated time system and began paying POV technicians on a piece-point system. Under this system, each work order was assigned a certain number of points, and technicians were paid a rate of $5.97 per point on completed work orders. Technicians were not required to keep time sheets.

The automated pay system downloaded time records from DirecTV's database of closed work orders and calculated technicians' work hours from the "start" time of the first closed job to the "stop" time of the last closed job. This method, according to Plaintiffs, also failed to capture all of their hours because, for example, after closing out the final job of the day, technicians performed additional work while off-the-clock, including educating customers, answering questions, programming the remote control, demonstrating use of the DVR, remote control, and other aspects of the system, and performing a final walk through to collect and remove trash, debris, tools, and equipment. The automated system also, allegedly, failed to record work time at a first or last job that failed to close, because, for example, the equipment could not be installed, the customer changed his or her mind and cancelled or modified the order, or the customer was not at home.

In accordance with a 2005 HSP entered into between BAI and DirecTV, BAI began converting POV technicians to COV technicians, and those technicians were provided company vans. BAI paid for fuel and maintenance, and basic tools. There were three types of COV technicians: (1) installer technicians who were generally assigned the task of installing new equipment; (2) service technicians who were generally more experienced and were primarily

assigned service calls; and (3) utility technicians who had yet to be assigned company vehicles and who borrowed other technicians' vehicles, or rode along and helped another technician complete his or her job assignment.

At the end of 2007, BAI began paying POV technicians an hourly rate. The effect was to bring POV technicians' pay in line with COV technicians.

Regardless of the categorization of the technician or whether he or she recorded his or her hours on a time sheet or they were captured through the automated system, Plaintiffs claim that they worked many hours per week without compensation – both for work performed before the first job of the day, and for work performed after the end of the last job. These tasks varied, and allegedly included the following, all of which were not compensated:

> ‣ Technicians were required to receive and review upcoming work assignments, either before or after work. To do this, the technician would have to either purchase a facsimile machine or run by the office to receive work assignments. The technician would also have to check the inventory in his or vehicle to ensure that he or she had the necessary materials for the day's assignment. If a technician needed additional material, he would either have to meet up with another technician in the field, or go by the warehouse to obtain the equipment that was needed.

> ‣ After reviewing work orders, technicians were required to "pre-call" customers, during which they would introduce themselves, verify that the work order was correct, confirm the customer's address and directions to the home, answer any questions, and apprise the customer of the expected arrival time. Additionally, technicians were required to map out their routes for the day.

> ‣ Technicians were required to inventory the tools in their vehicles on a regular basis, and account for all DirecTV equipment, including dishes, dish parts, DVRs, antennas, mounts, multi-switches, and cable assigned. They also were allegedly required to regularly conduct a small parts inventory count of other required equipment, including barrels, splitters, adaptors, phone jacks, blocks, clamps, straps, bolts, ties, bushings, clips, seals, tubes, batteries, anchor kits, wire, phone line, cable, connectors, shields, poles, dish braces, tape, filters, cable extensions, transformers, and screws. These inventories were performed off-the-clock, and faxed to BAI.

> ‣ In addition to using their personal facsimile machines to review upcoming work

assignments and confirm inventories, technicians also were required to review communications from BAI sent by fax, including memoranda that they were required to read, sign, and return. Technicians also used their machines to fax other items from home such as time sheets, daily mileage, required memos, and pre-call sheets.

▸ Because Defendants expected work vehicles to be clean (and randomly conducted inspections), technicians were required to clean the inside and outside of their vans regularly, on their own personal time.

▸ Technicians were required to collect, remove, and properly dispose of packaging materials, debris, and empty boxes from customers' homes, and they had to clean out their vans and dispose of the garbage that accumulated in their vans at home and/or after or before work.

▸ To increase productivity, technicians pre-built dishes at home which required them to take the dish out of the box, assemble the four components, and secure the dish in the vehicle. Relatedly, technicians pre-assembled jumpers at home which required that they cut a length of cable, fold the braid on each end of the cable up against the PVC jacket, and attach connectors to each end of the cable.

In addition, Plaintiffs allege that Defendants failed to include the value of commissions, bonuses, and other incentive payments in Plaintiffs' regular rate of pay for purposes of calculating overtime hours, and pay certain POV Plaintiffs the minimum wage by making deductions from their pay.

To show that the technicians' performed off-the-clock work on a routine and regular basis, with Defendants knowledge but without compensation, and in an effort to address manageability concerns, Plaintiffs have submitted a proposed trial plan. Under the proposed plan, Plaintiffs intend to present the testimony of not more than 60 representative plaintiffs who worked as POV and COV technicians, out of several of Defendants' offices. These representative technicians allegedly include a randomly selected mix of named, discovery, and non-discovery Plaintiffs.[2]

---

[2] Plaintiffs assert that because a number of the randomly selected technicians may be unable to testify for any of a number of reasons (including the possibility that some Plaintiffs may be dimissed on the basis of Defendants' pending motions for summary judgment or to dismiss), Plaintiffs intend to select other representative technicians based upon such factors as availability to testify, the time that they worked, and whether they worked in one or more locations and/or as both POV and COV technicians.

Plaintiffs expect that the representative technicians will testify about how much time they spent each week performing uncompensated work, and that they performed off-the-clock work activities on a regular and recurring basis. Plaintiffs intend to supplement this testimony with the testimony of management-level employees regarding the uniformity of Defendants' work rules and pay and time-keeping practices.

Plaintiffs also intend to use Dr. Louis Lanier as a summary witness under Fed. R. Evid. 1006 to link the amount of off-the-clock work for each technician to the to the actual recorded work hours and actual hourly pay rates of each of the 1,736 class members. In a Declaration, Dr. Lanier claims that he has received data for all the technicians and he has been able to use that data in conjunction with the four different pay systems Defendants utilized during the relevant period to "created] a summary data file with fields identifying, among other things: the plaintiffs, the amounts and types of pay received by each plaintiff (including commissions, bonuses, and other incentive payments), and the reported rates of pay and recorded hours of work on a week by week basis for the time period going back three years from the date a plaintiff's claim was filed in court until August 2008 or the plaintiff's termination of employment, whichever is earlier." (Docket No. 853-2, Lanier Decl. ¶ 4). He claims that from the data he has been able to design "a summary data file" which can be easily modified to address alternative calculations:

> 6. For example, if the evidence shows that the plaintiffs performed, on average, one hour of uncompensated off-the-clock work per day, I can tailor the damage calculation to account for such a finding by adjusting one input, and easily recalculate the amount of damages owed to each individual plaintiff, based on his/her specific work history and rates of pay.

> 7. Similarly, in the event that the plaintiffs do not prove one of their claims at trial, I could easily adjust the damages summaries to exclude any damages for that claim and recalculate the amount of damages owed to each individual plaintiff, based on his/her specific work history and rates of pay. For example, if plaintiffs fail to

prove a regular rate violation, I can adjust the damages to exclude that claim.

(Id. ¶¶ 6-7).[3]

Defendants now move to decertify the action, arguing that the technicians were not similarly situated. They also seek to dismiss the collective action except as to BAI.

### III. MOTIONS TO DISMISS THE COLLECTIVE ACTION

DirecTV and Mr. Bruiser request that the collective claims against them be dismissed because Plaintiffs never sought nor received permission from the Court to pursue collective claims against anyone other than BAI.[4] However, since those Motions were filed, the Court has issued a substantive ruling, finding that DirecTV is a successor employer to BAI, and that there is little doubt that DirectTV knew or should have known of the pending litigation because, when DirecTV acquired BAI, this case was among "Known Litigation," counsel in this case also represented BAI, and this litigation was in the loan document that DirectTV purchased from MB Financial. (Docket No. 811 at 12).

The Court also issued a substantive ruling finding that Mr. Bruister was an employer under the FLSA, inasmuch as he "was the backbone of BAI, was very involved in its operation, had a significant financial stake in the business, and was ultimately responsible for all important decisions, including those involving pay." (Docket No. 809 at 9). Moreover, Mr. Bruiser was added as a Defendant by virtue of the amended complaint at a time when Plaintiffs' motion for conditional

---

[3] In his summary calculations, Dr. Lanier used a "placeholder" of 1.5 hours per workday for unrecorded or unpaid off-the-clock work.

[4] Additionally, DirecTV has filed a Motion for Entry of Order Granting the Motion to Dismiss Collective Claims (Docket No. 694) because Plaintiff did not respond within the fourteen days provided by Local Rule 7.01(b). However, that Rule was trumped by the Scheduling Orders entered in this case (Docket Nos. 534 and 580) that enlarged the time for filing both responses and replies to dispositive motions. Thus, the Motion for Entry of Order will be denied.

collective action certification was pending before the Court.

Accordingly, the Motions to Dismiss the Collective Action will be denied.

## IV. __MOTIONS TO DECERTIFY__

Section 207(a) of the FLSA generally requires that employers pay employees specified hourly rates for up to 40 hours per week and pay overtime compensation of one and one-half times the regular rate for hours worked in excess of 40 hours. 29 U.S.C. § 207. Enforcement of this provision is authorized through collective actions brought by an employee on his own behalf and all those who are "similarly situated" and who "opt-in" by giving consent in writing to become a party. 29 U.S.C. § 216(b).

Essential to a collective action is that the employees be "similarly situated," and courts considering this question generally utilize a two-stage process. The first stage occurs early on in the litigation process (usually before the commencement of formal discovery) and, at this stage, a "'fairly lenient standard'" is employed "in determining whether plaintiffs are similarly situated" such that a class should be conditionally certified. White v. Baptist Memorial Health Care Corp., 699 F.3d 869, 877 (6th Cir. 2012). At the second stage (which usually occurs after the completion of discovery, and which the Court undertakes now), "courts apply a 'stricter standard' and more closely examine 'the question of whether particular members of the class are, in fact, similarly situated.'" Id. at 878. Thus, while the "fairly lenient standard" typically leads to conditional class certification, it is "'by no means final.'" Comer v. Wal-Mart Stores, Inc., 454 F.3d 544, 546-47 (6th Cir. 2006) (citation omitted).

Lead plaintiffs bear the burden of showing that opt-in plaintiffs are substantially similar. Frye v. Baptist Memorial Hospital, Inc., 495 Fed. App'x 669, 672 (6th Cir. 2012). That term is not

defined in the statute, but the Sixth Circuit "tacitly approved," id., three factors in O'Brien v. Ed

Donnelly Enterprises, Inc., 575 F.3d 567 (6th Cir. 2009) that a court may utilize when exercising its

discretion in determining whether certification is appropriate. Those factors are "'the factual and

employment settings of the individual plaintiffs, the different defenses to which the plaintiffs may

be subject on an individual basis, and the degree of fairness and procedural impact of certifying the

action as a collective action.'" Id. at 584.

In O'Brien, the Sixth Circuit did "not purport to create comprehensive criteria for informing

the similarly-situated analysis," id. at 585, but it did make several salient observations that guide this

Court's consideration. "Showing a "unified' policy is not required," and, unlike Fed. R. Civ. P.

23(b), just because individualized issues may predominate, this does not necessarily mean that a

collective action is inappropriate. Id. at 584. On the other hand, "it is clear that plaintiffs are

similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that

policy or of conduct in conformity with that policy proves a violation as to all plaintiffs." Id. at 585.

Similarly, plaintiffs can be similarly situated where "their claims [a]re unified by common theories

of statutory violations, even if the proofs of these theories are inevitably individualized and distinct."

Id.

In this case, Defendants collectively[5] raise a litany of reasons in support of their contention

that Plaintiffs are not similarly situated and, therefore, this action should be decertified. The Court

is unpersuaded by any of the arguments presented.

## A. Pending Motions and Other Litigation

---

[5] There are a number of arguments raised by both DirecTV and the Bruister Defendants. Many of
the arguments overlap, and the Bruister Defendants adopt all of the arguments raised by DirecTV.
Accordingly, and for the sake of simplicity, the Court will sometimes refer to the arguments collectively as
Defendants' arguments.

DirecTV identifies some eighteen motions that have been filed which it insists shows that the claims of the Plaintiffs are dissimilar. Those motions run the gamut from motions for summary judgment against a handful of Plaintiffs on judicial estoppel grounds, to the motion for summary judgment on the joint employer issue, to the motion for summary judgment on successor liability, to the motion for summary judgment on the Motor Carrier Exemption to a motion for summary judgment on the issue of damages, to motions to dismiss for lack of prosecution. DirecTV makes no effort to show why the existence of these motions makes the continuance of the collective action ill-advised.

None of the identified motions remotely establish that the claims in this case are not susceptible to class-wide treatment. Take for instance the motions relating to the joint employer issue and successor liability, which the Court has already ruled upon. The motions do not relate to the viability of the claims asserted by Plaintiffs, but rather who is to be liable should they prevail.

Or, consider the Motor Carrier Exemption motion. That too, does address not whether Plaintiffs worked off the clock doing specified tasks, but rather whether Defendants are insulated from overtime liability under the FLSA during the period between August 10, 2005, and August 9, 2006. Inasmuch as this issue hinges on Defendants' knowledge and actions, it is common to all Plaintiffs. Moreover, even assuming Defendants prevail on this issue, the impact of the exemption is something to be addressed in calculating unpaid wages, and is not an issue going to whether Defendants' knowingly allowed (or expected) their technicians to perform uncompensated work.

Some motions are individual-Plaintiff specific, but again do not establish the need for 1,736 separate lawsuits. For example, Defendants have filed motions for summary judgment against named Plaintiffs who have filed for bankruptcy, but failed to list this litigation in their schedules.

Assuming Defendants prevail on those motions, that just means that those Plaintiffs are judicially estopped from pursuing their claims, not that they and the other Plaintiffs did not perform work off-the-clock with Defendants' knowledge. Presumably, in a class this size, there may be other opt-in Plaintiffs who similarly filed bankruptcy but neglected to list this litigation. However, "[b]ankruptcy and credibility defenses do not necessarily preclude collective treatment." White v. Baptist Memorial Health Care Corp., 2011 WL 1883959 at *12 (W.D. Tenn. May 17, 2011); see, Crawford v. Lexington-Fayette Urban County Gov't, 2008 WL 2885230 at *11 (E.D. Ky. July 22, 2008) (citation omitted) ("'lack of standing due to bankruptcy filings would not require individualized proof at trial' because 'the effect of the bankruptcy filings of [the plaintiffs] is a legal question for the court'"). Likewise, a combined motion to dismiss several of the technicians for failure to prosecute because they did not show up at scheduled depositions hardly requires decertification, as that failure does not go to the overarching question of whether technicians worked off-the-clock with Defendants' knowledge or acquiescence.

DirecTV also argues that a race discrimination complaint filed against BAI by five named technicians in this case raises individualized issues because the claim there was that those technicians were routed differently than white technicians, and one of the claims here is that technicians were not properly compensated for drive time. The merits of the race discrimination case were never decided and it was settled for a confidential amount, apparently before discovery was even conducted, and, in any event, the issue of routing was just one of the allegations. Regardless, DirecTV cites no authority for the proposition that being a defendant in a Title VII claim serves as a shield to an FLSA claim, and its argument is a non-sequitur: whether black technicians were treated differently from white technicians in regard to routing is irrelevant to the question of

whether all technicians were deprived of overtime pay based, in part, on uncompensated drive time.

## B. Piece-Rate Technicians

"When an employee is employed on a piece-rate basis, the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and all other sources (such as production bonuses) and any sums paid for waiting time or other hours worked (except statutory exclusions)." 29 C.F.R. § 778.111. "This sum is then divided by the number of hours worked in the week for which such compensation was paid, to yield the pieceworker's "regular rate" for that week." Id.[6] "For overtime work the pieceworker is entitled to be paid, in addition to the total weekly earnings at this regular rate for all hours worked, a sum equivalent to one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week." Id.[7]

DirecTV argues that, if this continues as a collective action, "there is no possible way for the court or jury to manage" the variables involved in determining the proper amount of pay for the technicians who worked on a piece-rate basis:

> As can be imagined, the piece-rate analysis is complicated for one installer who has worked several months. Production output can vary from installer to installer. The pieceworker's "regular rate" can vary from week to week depending on production. Some installers received bonuses; others did not. Some installers

---

[6] The regulations also contain an alternative method of calculation. 29 C.F.R. § 778.118.

[7] The regulations go on to state that "[o]nly additional half-time pay is required in such cases where the employee has already received straight-time compensation at piece rates or by supplementary payments for all hours worked." and provides the following illustrative example:
> [I]f the employee has worked 50 hours and has earned $491 at piece rates for 46 hours of productive work and in addition has been compensated at $8.00 an hour for 4 hours of waiting time, the total compensation, $523.00, must be divided by the total hours of work, 50, to arrive at the regular hourly rate of pay--$10.46. For the 10 hours of overtime the employee is entitled to additional compensation of $52.30 (10 hours at $5.23). For the week's work the employee is thus entitled to a total of $575.30 (which is equivalent to 40 hours at $10.46 plus 10 overtime hours at $15.69).
Id.

13

regularly worked and received overtime; others did not. Accordingly, the results of the required piece-rate analysis for each installer who worked under this system (not all did) is too varied and thus individualized and decertification is required for this reason alone. Also, to the extent any overtime was incurred prior to August 9, 2006, those Plaintiffs who were paid on a piece rate system have no claim pursuant to the Motor Carrier Act and its safe harbor.

         \*              \*              \*

Additional complications abound with this piece-rate analysis. In this case, assuming Plaintiffs can prove they worked hours for BAI which were not recorded on their timesheets, then to properly calculate any alleged damages will require a per employee, per pay week analysis of the compensation already paid to determine what, if anything each claimant is owed. . . .

(Docket No. 675 at 7-8).

The fault in DirecTV's argument is evidenced in its last sentence because "'[a]lthough plaintiffs' claims may raise individualized questions regarding the number of hours worked and how much each employee was entitled to be paid, those differences go to the damages that each employee is owed, not to the common question of Defendant['s] liability.'" Espinoza v. 953 Assocs. LLC, 280 F.R.D. 113, 130 (S.D.N.Y. 2011) (quoting, Swigart v. Fifth Third Bank, 288 F.R.D. 177, 184 (S.D. Ohio 2012)); see, Shahriar v. Smith & Wollensky Restaurant Group, Inc., 659 F.3d 234, 253 (2nd Cir. 2011) (citation omitted) ("'Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues.'"). In fact, it has been stated by the Sixth Circuit (at least in the context of a Fed. R. Civ. P. 23 class action) that "[n]o matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action." Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1197 (6th Cir. 1988). This is so because "it is possible that representative testimony from a subset of plaintiffs could be used to facilitate the presentation of proof of FLSA violations, when such proof would ordinarily be individualized," O'Brien, 575 F.3d at 585, and that "[t]he

testimony of fairly representative employees may be the basis for an award of back wages to nontestifying employees," United States Dep't of Labor v. Cole Enters., Inc., 62 F.3d 775, 781 (6th Cir.1995) (citations omitted).

This is not to say that variance in damages across class members cannot serve as a basis for decertification. In fact, in a recent case cited by DirecTV in its supplemental brief, the Seventh Circuit in Espenscheid v. DirectSat USA, LLC, 705 F.3d 770 (7th Cir. 2013) upheld the decertification of a collective action for this very reason. Though not controlling, Espenscheid gives pause for thought because it involved similar claims and echoes many of the concerns raised by Defendants.

In Espenscheid, some 2,300 cable technicians brought an FLSA action, alleging their employer failed to pay them for all hours worked. The technicians were piece-rate workers and they claimed (like the technicians here) that they were not paid for such tasks they performed on their own time, such as calling customers, filling out paperwork, and picking up tools from the warehouse.

In noting the problems inherent in determining piece-rate wages across-the-board, the Seventh Circuit wrote:

> When one is paid by the job rather than by the hour, the hourly wage varies from job to job and worker to worker. Suppose the same job, for which the piece rate is $500, is completed by one worker in 30 hours (and it is the only job he does that week) and by another in 60 hours (also in a week). The hourly wage of the first worker, $16.67, will be well above the minimum wage, and as he has no overtime either, he has no damages. The hourly wage of the second worker, $8.33, is also above the minimum wage, but he is entitled to 1.5 times that amount for 20 of his 60 hours and thus to a total wage of $583.10 (($8.33 x 40) + ($8.33 x 1.5 x 20)), making his damages $83.10 if DirectSat paid him only $500 for the job. The plaintiffs have not indicated how their method of "representative" proof would enable these workers to be separated when it came time to calculate damages.

Id. at 774. The court went on to point out that a "further complication is presented by a worker who underreported his time, but did so . . . not under pressure by DirectSat but because he wanted to impress the company with his efficiency." Id. Still "[a] further complication is that the technicians have no records of the amount of time they worked but didn't report on their time sheets," and this was a problem which could not be addressed based upon the "evidence of a small, unrepresentative sample of technicians." Id. at 775.

In the abstract, Espenscheid could conceivably be read as an overall indictment of utilizing a collective action as a vehicle to establish liability in piece-rate cases, but the Court does not read the case so broadly because the Seventh Circuit was presented with little choice but to hold as it did, given the lack of cooperation by plaintiffs' counsel in explaining how they intended to prove up their case. In the trial court, "[t]he judge asked the plaintiffs' lawyer to propose a specific plan for litigating the case within the framework she established," and "[t]he plaintiffs responded rather truculently by opposing bifurcation and subclasses and refusing to suggest a feasible alternative, including a feasible method of determining damages." Id. at 775-76. Instead, they "[e]ssentially asked the district judge to embark on a shapeless, freewheeling trial that would combine liability and damages and would be virtually evidence-free so far as damages were concerned." Id. at 776. Further, while plaintiff sought to use "representative" testimony of 42 technicians, "[c]lass counsel [did] not explain in his briefs, and was unable to explain to [the appellate panel] at oral argument though pressed repeatedly, how these 'representatives' were chosen – whether for example they were volunteers or perhaps selected by class counsel after extensive interviews and hand picked to magnify the damages sought by the class." Id. at 774.

In this case, Plaintiffs counsel have made the effort that was lacking in Espenscheid. They

have submitted a trial plan and have explained how they selected the "representative" technicians.[8]

Further, even if Espensheid is read as a an overall condemnation of the collective action in a piece-rate case, the decision is based upon a premise which the Sixth Circuit has not specifically endorsed. The Seventh Circuit stated that "despite the difference between a collective action and the absence from the collective-action section of the Fair Labor Standards Act of the kind of detailed procedural provisions found in Rule 23, . . . there isn't a good reason to have different standards for the certification of the two different types of action and the case law has largely merged the standards, though with some terminological differences." Id. at 772. However, in O'Brien, which the Seventh Circuit cited as contrary authority, the Sixth Circuit explicitly held that there is a distinction between collective actions under the FLSA and class actions under Rule 23, and that it is improper to "apply a Rule 23-type analysis" in FLSA collective actions because Rule 23 "is a more stringent standard than is statutorily required." O'Brien, 575 F.3d at 584-85.

## C.  Comcast Corp. v. Behrend

DirecTV argues that the Supreme Court's recent decision in Comcast Corp. v. Behrend, 133 S.Ct. 1426 (2013) "compels decertification" because "a cursory review of [Plaintiffs' damages] reports show that the translation of their alleged FLSA violations into proof of liability is a per person, per pay week analysis." (Docket No.833 at 3). The Court disagrees.

Comcast involved the class certification of more than 2 million current and former Comcast subscribers who sought damages for alleged antitrust violations. The Third Circuit determined that the putative class satisfied Rule 23(b)(3)'s predominance requirement, opining that, at the class

---

[8] Whether or not the selected are truly representative has yet to be established, and the Court will address that issue and Plaintiffs' proposed trial plan at a hearing to be set by Order issued contemporaneously herewith.

certification stage, the class did not have to tie each theory of antitrust impact to an exact calculation of damages. Id. at 1431. The Supreme Court reversed, holding that Rule 23(b)(3) had not been satisfied because, even though damage "[c]alculations need not be exact," any "model supporting a 'plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.'" Id. at 1433 (citations omitted). As the Sixth Circuit recently explained:

> . . . Because the plaintiffs would be entitled to damages resulting only from the allowed liability theory if they were to prevail on the merits, the Court instructed that the "model purporting to serve as evidence of damages . . . must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."

> Neither the Third Circuit nor the district court had required the plaintiffs to link each liability theory to a damages calculation because, those courts reasoned, doing so would necessitate inquiry into the merits, which had no place in the class certification decision. The Supreme Court rejected that analysis as contradictory to [Wal–Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541 (2011)], and as improperly permitting plaintiffs to offer any method of damages measurement, no matter how arbitrary, at the class-certification stage, thereby reducing the predominance requirement of Rule 23(b)(3) "to a nullity.". . . Due to the model's inability to distinguish damages attributable to the allowed theory of liability, the Court ruled that the predominance prerequisite of Rule 23(b)(3) did not warrant certification of a class.

In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig., ___ F.3d ___, ___ 2013 WL 3746205 at *13 (6th Cir. July 18, 2013) (internal citations to Comcast omitted).

From Comcast and Amgen Inc. v. Conn. Retirement Plans & Trust Funds, 133 S.Ct. 1184 (2013), the Sixth Circuit in In re Whirlpool "glean[ed] . . . that to satisfy Rule 23(b)(3), named plaintiffs must show, and district courts must find, that questions of law or fact common to members of the class predominate over any questions that affect only individual members." In re Whirlpool Corp., 2013 WL 374206 at *18. The Ninth Circuit voiced a similar understanding in a wage and

18

hour case in <u>Leyva v. Medline Indus. Inc.</u>, 716 F.3d 510 (9th Cir. 2013). There, while acknowledging that under <u>Comcast</u> "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability," the court held that <u>Comcast</u> is not a bar "if putative class members prove [defendant's] liability" and that "damages will be calculated based on the wages each employee lost due to [defendant's] unlawful practices."

Here, Plaintiffs intend to establish damages stemming from Defendants' policies and practices; damages which will be calculated based upon the wages each technician lost due to those policies and practices. <u>Comcast</u> does not require decertification.

**D.  Individualized Inquiries Into Each Class Member's Duties and Dr. Lanier's Report**

Defendants argue at length about the alleged dissimilarities between technicians and the "highly individualized" questions that would have to be answered "as to each class member's circumstances every day of every week." (Docket No. 677 at 9). They claim that "[t]his Court necessarily would have to conduct an individualized inquiry into each class member's duties each week in order to determine whether that class member worked more than forty hours that week or did not receive minimum wage" and "would have to conduct individualized inquiries to determine whether each class member allegedly worked off-the-clock during any given week and, if so, how much they allegedly worked off-the-clock." (<u>Id</u>.). More specifically, the Bruister Defendants insist that this case cannot be maintained as a collective action because, with respect to each of the more than 1,700 technicians, "Plaintiffs must offer substantial and sufficient evidence to answer" each of the following questions:

•  What weeks did each class member work and in what capacity?

•  What duties did each class member perform each day of each week they worked?

• If Plaintiffs had a daily "route" that did not include first going to a local office for any reason, how long did each class member's route take to perform each day and each week?

• If Plaintiffs had a daily "route" that did include first going to a local office for any reason, how long did each class member's route take to perform each day and each week, did they report, as required, to their local payroll supervisor or manager to be clocked in?

• If Plaintiffs attended a meeting, did they sign, as required, the sign-in log so that they would be paid for their time at such meetings?

• For any alleged non-route duties, how long did it take to perform these duties each day and each week?

• For all other non-driving duties, how long did it take to perform these duties each day and each week?

• For each task performed each day, did each class member work off-the-clock on that task?

• If so, how much off-the-clock time did each Plaintiff work on each task?

• Based upon the above answers, what were the totals hours worked each week by each class member?

• How much was each class member paid each week compared to how much they should have been paid?

(Id. at 14-15).

As noted, the FLSA requires employers to pay their employees a specified minimum hourly wage and at least one and one-half times their regular pay for hours worked in excess of 40 hours each week. 29 U.S.C. § 207(a). This does not mean (as Defendants appear to suggest), however, that Plaintiffs must "'prove each hour of overtime work with unerring accuracy or certainty.'" Hilton v. Exec. Self Storage Assoc., Inc., 2009 WL 1750121 at *4 (S.D. Tex. 2009) (quoting, Pforr v. Food Lion, Inc., 851 F.2d 106, 108 (4th Cir. 1988)).

Rather, a "FLSA plaintiff has the burden of proving by a preponderance of the evidence that

he or she 'performed work for which he [or she] was not properly compensated.'" <u>Oldham v. U.S.</u>

<u>Postal Serv</u>, 465 Fed. App'x 440, 444 (6th Cir. 2012). "To determine the extent of damages, the

plaintiff can prove his or her under-compensation damages through discovery and analysis of the

employer's code-mandated records." <u>O'Brien</u>, 575 F.3d at 602. "However, if the employer kept

inaccurate or inadequate records, the plaintiff's *burden of proof is relaxed*, and, upon satisfaction

of that relaxed burden, the onus shifts to the employer to negate the employee's inferential damage

estimate." <u>Id</u>. (italics in original, <u>citing</u>, <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680 (1946).

In this case, Plaintiffs intend to prove their damages utilizing this relaxed standard, relying

to a great extent on Dr. Lanier's report and calculations. While DirecTV is quick to point out that

Dr. Lanier states that the "data provided by the defendants are sufficiently comprehensive . . . to

permit me to design a summary data file," (Docket No. 853-2, Lanier Decl. ¶ 5), it is clear that the

"data" he intends to work with is the *reported* hours kept by Defendants, and Plaintiffs' underlying

premise is that Defendants failed to record the time the technicians spent on a regular and recurring

basis working off-the-clock without compensation on task such as pre-calling, inventory, pre-

building equipment, and cleaning vehicles.[9]

That said, the relaxed burden applies only to damages, not liability. As the Sixth Circuit in

<u>O'Brien</u> explained:

> . . . <u>Mt. Clemens Pottery</u> and its progeny do not lessen the standard of proof

---

[9] As the Court understands it, Dr. Lanier's calculation will be Plaintiff-specific, will be based upon that technician's status, will be linked to each week worked and in what capacity and under which pay system, thereby eliminating some of the arguments raised by Defendants, such as potential recovery for weeks when a particular technician did not even work. Obviously, the Court at this point does not consider whether Dr. Lanier is in reality an expert disguised as a Rule 1006 summary witness. Nor does the Court pass on the viability of Plaintiffs' proposed damage calculations or models, or whether their proposals are a fair way to ascertain damages. Defendants have filed a Motion for Summary Judgment on Damages and that, too, will be considered at the hearing to be set by contemporaneous Order.

for showing that a FLSA violation occurred.  Rather, <u>Mt. Clemens Pottery</u> gives a FLSA plaintiff an easier way to show what his or her damages are.  When an employer keeps inaccurate or inadequate records, for a FLSA plaintiff to show what his or her damages were, a FLSA plaintiff does not need to prove every minute of uncompensated work. Rather, she can estimate her damages, shifting the burden to the employer.  If the employer cannot negate the estimate, then the court may award damages to the employee, even though the result be only approximate."  <u>Mt. Clemens Pottery</u>, 328 U.S. at 688.  In short, <u>Mt. Clemens Pottery</u> does not help plaintiffs show that there was a violation under the FLSA.  It would only allow them to prove damages by way of estimate, if they had already established liability.

575 F.3d at 602-3.

On the issue of liability, Section 216(b) requires that the employees be "substantially similar," not identical; "even at the decertification stage, similarly situated does not mean identically situated." <u>Wilks v. Pep Boys</u>, 2006 WL 2821700 at *3 (M.D. Tenn. Sept. 26, 2006); <u>see</u>, <u>Spencer v. No Parking Today, Inc.</u>, 2013 WL 1040052 at *8 (S.D.N.Y. Mar. 15, 2013) ("it is sufficient to show that [the employees] all were subject to the same unlawful policy, regardless of how 'widespread' the effect"); <u>Houston v. URS Corp.</u>, 591 F. Supp. 2d 827, 832 (E.D. Va. 2008) ("That is not to say that there can be no differences among class members or that an individualized inquiry may not be necessary in connection with fashioning the specific relief or damages to be awarded to each class member. Rather, the inquiry is whether the presence of common issues allows the class-wide claims to be addressed without becoming bogged down by individual differences among class members").  Rare would be the collective action – or class action for that matter –  where the employees labored under the exact same circumstances.  Indeed, "[i]f one zooms in close enough on anything, differences will abound[.]" <u>Frank v. Gold 'n Plump Poultry, Inc.</u>, 2007 WL 2780504 at *4 (D. Minn. Sept. 24, 2007).

As already observed, <u>O'Brien</u> teaches "that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity

with that policy proves a violation as to all the plaintiffs." O'Brien, 575 F.3d at 584. Here, the record suggests that all technicians performed the same job duties – i.e., installing and servicing DirecTV products at customers' homes and offices. It also suggest that the work activities for which plaintiffs were not paid – performing inventory, building equipment, pre-calling customers and the like – were included among the job duties of all technicians. Moreover, it does not appear that the policies and procedures governing the technicians' work, varied among the BAI locations, and the time-keeping, payroll, and human resources policies and procedures were all set by Defendants' management and applied uniformly to all BAI technicians regardless of work location.

Further, and as Plaintiffs point out, they assert three common claims in this lawsuit: (1) defendants failed to properly calculate the rate at which overtime was paid; (2) defendants failed to pay POV technicians minimum wage during their first week of training and when deductions or de facto deductions dropped POV technicians' pay below the minimum wage; and (3) defendants failed to pay plaintiffs overtime for work that defendants knew (or should have known) that the technicians were performing on a regular and recurring basis. Having reviewed the record and the arguments of the parties,[10] the Court agrees that each of these common claims is unified by a common thread and therefore susceptible to class-wide treatment.

For example, the regular rate claim is unified by the common theory that Defendants failed

---

[10] This includes a chart of deposition testimony which Defendants claim shows that the technicians' testimony about the work they performed of the clock varies widely. Even assuming those excerpts contain all that was said by a technician on a particular matter, the Court does not view the testimony as requiring decertification because the chart itself confirms that Plaintiffs consistently testified that they performed a great deal of uncompensated work. See, Falcon v. Starbucks Corp., 580 F.Supp.2d 528, 536 (S.D. Texas 2008) ("That [plaintiffs] did not perform exactly the same duties off-the-clock does not undermine the conclusion that the putative class is similarly situated. All of the deposed opt-ins allege that they were not compensated for job duties they performed over 40 hours either because they worked those hours off-the-clock or because managers shaved time off of hours they reported.").

to include certain payments, including commissions bonuses, and other incentive payments in the regular rate at which the technicians were paid overtime.  Similarly, Plaintiffs claim that the POV technicians' pay during their first week was reduced below the minimum wage is common in that all of those technicians were required to pay for their tools out of their salary.

Contrary to DirecTV's assertion, the fact that COV technicians (at least those who were not first POV technicians) do not have a minimum wage claim does not mean that decertification of the entire action is necessary, and even the fact that COV technicians were paid hourly as opposed to on a piece-rate basis does not mandate that result.  If necessary, the COV technicians and the POV technicians can be placed into sub-groups for collective treatment, and other sub-groups or sub-classes may be necessary as well.  See, Alvarez v. City of Chicago. 605 F.3d 445, 49 (7th Cir. 2010) ("if common question predominate, the plaintiffs may be similarly situated even though the recovery may be determined by only a subset of those common questions"); Stout v. Remetronix, Inc., 2013 WL 4048241 at *3 (S.D. Ohio Aug. 9, 2013) ("If some of the opt-in field technicians are dissimilarly situated in a material respect, subclasses or resolving their claims on the merits may avoid decertification of the entire collective action.  These are considerations properly addressed at the second stage");  Ballou v. iTalk, LLC, 2013 WL 3944193 at *3 (N.D. Ill. July 31, 2013) ("During the second step, if the court finds insufficient similarities between the plaintiffs, it may revoke conditional certification or divide the class into subclasses").[11]

---

[11] Also contrary to DirecTV's assertion, O'Brien does not require decertification simply because not all of the technicians may have a minimum wage claim.  O'Brien affirmed decertification where the plaintiff failed to alleged that she suffered from either of the two allegedly unlawful practices asserted by the lead plaintiffs.  Even so, the Sixth Circuit wrote:

> In general, though, a district court should examine whether partial decertification is possible, when faced with the situation where a subset of the plaintiffs fail to allege violations of the FLSA.  The option of partial certification is important to consider, because it counters the

**E.  Manageability, Fairness and Due Process**

Defendants argue that, given the classification of technicians, the number of hours worked during a given week, the variation in damages, and the different possible defenses (among other things), it would be unfair to them and violate their due process rights to maintain this case as a collective action.  However, Defendants' "rights must be balanced with the rights of the plaintiffs, many of whom likely would be unable to bear the costs of an individual trial, to have their day in court."  Wilks, 2006 WL 2821700 at *3.  "Congress, in seeking to allow plaintiffs to vindicate their rights under the FLSA, provided them with the opportunity to do so collectively when appropriate."  Id. (citing 29 U.S.C. § 216(b)).

In a case involving cable technicians presenting some claims not unlike those here, then-District Judge Bernice Donald found collective treatment appropriate, writing:

> Fairness and procedural considerations also strongly militate against decertification.  If not addressed as a collective action, the claims of the plaintiff class would have to be heard in individual suits—perhaps requiring more than 300 mini-trials.  The investment of time and resources required for this many separate trials would render adjudication of Plaintiffs' claims so unwieldy and expensive as to substantially hinder, if not preclude, their resolution by judicial means.  Such a result is incompatible with the goals of FLSA collective actions, which include facilitating trial of claims that otherwise would be too cost-prohibitive to warrant independent litigation.

Monroe v. FTS USA, LLC, 763 F. Supp.2d 979, 996 (W.D. Tenn. 2011).  This Court agrees with

---

argument that a collective action must be totally decertified if some members are not similarly situated to the others.  In general, plaintiffs who are not similarly situated-for instance, plaintiffs who did not allege suffering under either unlawful practice-could be dismissed while keeping intact a partial class.  Plaintiffs who do present evidence that they are similarly situated to the lead plaintiffs should not be barred from the opportunity to be part of a FLSA collective action, because the collective action serves an important remedial purpose.  Through it, a plaintiff who has suffered only small monetary harm can join a larger pool of similarly situated plaintiffs.

O'Brien, 575 F.3d at 586.

those observations.

Moreover, "[a] district court has wide discretion to manage collective actions," <u>Alvarez</u>, 605 F.3d at 449, and many fairness and due process concerns can be addressed through trial management, such as the bifurcation of liability and damages, and/or dividing the action into various subclasses. <u>Russell v. Illinois Bell Telephone Co., Inc.</u>, 721 F. Supp.2d 804, 824 (N.D. Ill. 2010); <u>see</u>, <u>Espenscheid</u>, 705 F.3d at 775 ("Bifurcation would not eliminate variance in damages across class members, but once liability is established damages claims can usually be settled with the aid of a special master, and trials thus avoided,"). While "sifting through the subclaims . . . is an unenviable task," it is better that 1,700 plus trials and, in any event, plaintiffs like defendants "are . . . entitled to their day in court." <u>Alvarez</u>, 605 F.3d at 450.

## V. <u>CONCLUSION</u>

On the of the foregoing, Defendants' Motions to Dismiss Collective Action and their Motions to Decertify will be denied.

An appropriate Order will be entered.

Kevin H. Sharp
Kevin H. Sharp
United States District Judge